UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------X

MARIE SHERLY SALVODON

    Plaintiff,    07 174 COMPLAINT

-against-    VITALIANO, J.

THE CITY OF NEW YORK,
THE NEW YORK CITY POLICE DEPARTMENT  **JURY TRIAL DEMANDED**

BLOOM, M.J.

    Defendants.
-----------------------------------------------X


RECEIVED JAN 10 2007 PRO SE OFFICE

I. Parties:

| | | | |
|---|---|---|---|
| Plaintiff | Marie Sherly Salvodon | , resides at | 41 Nostrand Apt. 6C Brooklyn, N.Y 11206 |
| Defendant | Sergeant Joseph Ricotta | , resides at | 070 Precinct . |
| Defendant | Captain Mark DiPaolo | , resides at | Patrol Borough Brooklyn South . |
| Defendant | Sergeant Robert Murray | , resides at | 070 Precinct . |
| Defendant | Sergeant Stacey Simone | , resides at | 070 Precinct . |
| Defendant | Sergeant Jane Doe | , resides at | 070 Precinct . |
| Defendant | Sergeant Edward Deighan | , resides at | 070 Precinct . |
| Defendant | Sergeant Gary Hellriegel | , resides at | Brooklyn South Investigation Unit . |
| Defendant | Lieutenant Richard Tully | , resides at | Brooklyn South Investigation Unit . |
| Defendant | Lieutenant Vincent Cirrito | , resides at | Integrity Control Officer 070 Precinct . |
| Defendant | Police Officer Alessandro Longardino, | resides at | 070 Precinct . |
| Defendant | Police Officer William Ubieta | , resides at | 070 Precinct . |
| Defendant | Police Officer Chris Ottomanelly, | resides at | 070 Precinct . |
| Defendant | Police Officer Michael White | , resides at | 070 Precinct . |
| Defendant | Police Officer Candace Harris , | resides at | 070 Precinct . |
| Defendant | Police Officer Burtchell | , resides at | ESU City-Wide Blood Hound . |
| Defendant | John Doe #1 (DET Squad) | , resides at | 070 Precinct . |
| Defendant | John Doe #2 (DET Squad) | , resides at | 070 Precinct . |

II. The jurisdiction of the Court is invoked pursuant:

a. Violation of public employee under federal and state constitution which is actionable under civil right act of 1871, 42 USCA § 1983 or 42 USCA § 1331.

b. Violation of civil servant constitutional rights which does not require exhaust state administrative remedies before bringing a suit under 42 USCA § 1983.

c. Federal Tort Claims Act (28 U.S.C. §§ 2671-80).

d. Privacy Act (5 U.S.C. § 552).

e. Federal Defendants 28 U.S.C § 1391 (e)

III. On Monday, October 10th, 2005 at approximately 11:50 a.m. I (Marie Salvodon) was at my domicile at 425 Marlborough Road 2nd Floor apartment, Brooklyn, New York, 11226 when I heard a loud noise emanating from my kitchen. As I walked over from the bathroom which is across the hall from the kitchen I discovered my rear kitchen door was broken by three Caucasian males and an African American male plain clothes police officers that were later identified to me by Sergeant Stacey Simone at the 070 precinct upon my suspension. Additionally, I was served charges and specification that identified the afore mentioned plain clothes police officers as the following anti- crime officers Sergeant Joseph Ricotta, (tax # 895904, Shield # 4750), Police Officer William Ubieta, (tax # 916828, Shield # 7859) , Police Officer Alessandro Longardino, (tax # 93394, Shield # 10205), Police Officer Chris Ottomanelly, (tax # 930892, Shield # 17807), and Police Officer Michael White, (tax # 907749, Shield # 7579). I did not hear any knocking or verbal police identification prior to or after the forceful entry of my residence. As

they stood in the threshold of my door huddled together arm and arm, the tallest of the officers (the sergeant) made this statement to me, "we are responding to a burglary in the first floor window." When I proceeded to question them as to why my door was broken down one of the white male officers said, "Get the Fuck out of the way we need to come in!" While making fervent movement towards me. I then replied, "I live here and there is no burglar in my apartment and who are you?" Then, one of the shorter Caucasian male officers along with the tall African American male officer simultaneously stated, "We received a call saying someone broke into a window on the first floor (It sounded as though their statement was rehearsed, but none of the officers knew who was suppose say that statement first." Then, I went on to say to the officers, "I did not call for help so I would like an explanation for why you broke my door without as much as a verbal identification as police officers on a scene." I went on to tell the officers as they continued to forcibly enter further into my apartment that I was on the job as a police officer and you cannot enter my home without a warrant because I know my rights. So, please call your duty captain and have him respond here because a city involved has to be done for the broken door which has to be fixed and I have a complaint to file." At this point in time, the sergeant threatened me by saying, "This is an illegal attic apartment and we are going to get you kicked out of here, so get out of our way!" As I requested for the sergeant to call central and have a duty captain respond to the scene the officers preceded to retreat down the back spiral staircase. As I attempted to push close what was left of my door the sergeant again tried to belittle me ostracizing my Haitian accent saying, "yang, yang, yang…you're going to get a clue we are running shit here." They all begin to laugh. I adamantly replied, "Unless you can justify the real reason why you violated my fourth amendment rights get away from my door!" At this time I pushed the door as much as possible but it was unable to close so it remained opened. Still unable to identify these plain clothes officers by name or badge number I feared for the safety of myself, my infant grandchildren, childcare provider, and my son

who was on the premises. Within in the minute I walked over to the front of the house to the living room to see if the plain clothes officers had left the premises, that's when I noticed at least a dozen or so uniformed as well as plain clothes officers in front of the house. In the middle of the crowd one officer dressed in a white shirt stood out to me. By his uniformed attire I recognized him to be a boss. I saw the plain clothes officers that were in my kitchen have a brief discussion with this supervisor. I was surprised that he got to the location as quickly as he did. It was my professional opinion that he must have been on the scene already. As I grabbed my bag and proceeded to go down the front stairs with my identification card on hand he walked up the stairs of the front porch meeting me three quarters of the stairs leading up to my apartment. He identified himself as duty Captain Mark DiPaolo and I handed him my police identification card and identified myself as a police officer. As I am doing this he excused himself and stepped outside. He spoke briefly with someone that was out of my sight. I believe it to be one of the men who threaten me at my back door because he would return a few seconds later to speak of the same burglary suspect without identifying the alleged burglary suspect whom they were seeking. For the second time he would excuse himself again only to return and question me about my three children. When he asked, "How many children I had?" I replied "Three." And when he asked, "How old were they?" I replied, "Twenty, Nineteen, and Sixteen years old." Then I went on to say, "What do my children have to do with those cops breaking an entering into my apartment and this burglary?" I also went on to elaborate on the fact that I am the legal tenant of the second floor apartment. As he held the card in his hand he would excuse himself for the third time, upon his return he specifically asked me, "Where is Darren Flowers your nineteen year old son?" This time he would remain three steps below the stairs and requested my cooperation in getting my soon to answer some question in regards to the burglary. Because of the manner this situation was approached by the first responders to the scene I felt uncomfortable about letting them enter my home, but nonetheless, I made every effort to cooperate with the

Captain Dipaolo provided that certain safety precautions were met. Furthermore, I explained to him that I had infant children under the age of three in the house and I would appreciate it if he and one of his officers to accompany me up the front stairway leading to Darren's bedroom with no casualties. One unidentified officer along with Captain Dipaolo accompanied me to the bedroom where I directed Darren to come out of the room to answer some questions. I accompanied Darren hand in hand down the front stairway while Captain Dipaolo and the unnamed officer followed. As Darren and I approached the front door I released him and he was placed under arrest by anti- crime team officer Michael White. As Officer Michael White placed handcuffs on Darren's wrists, Darren asked, "What am I being arrested for?". Officer Michael White then replied, "Burglary." After Darren was removed in a patrol car from the scene at approximately 12:10 p.m. Captain Dipaolo called all the first responding officers to the side and spoke for about two minutes among themselves. At which point Captain Diapaolo would personally order me removed from the scene by means of a verbal threat. I was then driven by above mentioned Sergeants Murray and Simone via the 070 precinct radio motor patrol car. I would remain there in the CPU unit in the basement from time of arrival at 12:20 p.m. to 5:00 p.m., held against my will by Sergeant Stacey Simone. I knew I was not free to leave due to the fact that I called my son to bring me food and medication to the 070 precinct. The two times Sergeant Simone left the room she was replaced by an unidentified Caucasian female (possibly Hispanic/White) sergeant in plain clothes for a hour when she went to meal and when my son came to bring food at about 2:30 p.m. He called me by cell phone before he left the precinct and identified a blond female Sergeant that told him I could not have any visitors and that I was not free to leave. When I went to the rest room I was accompanied by the officer like a prisoner who is under arrest which made me feel extremely uncomfortable. The alleged investigation about the burglary quickly became official misconduct by these police officers who intentionally inflict emotional distress to me as I was denied my medication and food for hours. Upon my

arrival to the precinct I have not yet had breakfast when I was getting ready to go to the hospital for an old line of duty pre-operative blood screening for my right shoulder impingement that was severely damaged from a car accident in a patrol car, on 5/17/05. Additionally, I am asthmatic and I was also suffering from Herniated Lumbar of my L5 S1 disk when I informed Sergeant Simone I needed my medication she would disregard my request for the entire time I was in pain. After returning from the bathroom I proceeded to ask Sergeant Simone if I was under arrest and if so I want a PBA attorney. She did not reply. Sergeant Murray walked in shortly there after and they would convene outside CPU office for a brief period of time. At the end of the conversation Sergeant Murray re-entered the room and he would notify me that the 070 precinct PBA delegate requested my presence up stairs. At this time I was also concerned about my son's well being because I was not aware of his where about and what was going on with him in the precinct. As I sat down at the conference table in what appeared to be an arrest processing room with Mr. Joe Cole whom spoke to me briefly in a very professional manner about possibly making an official statement in regards to the incident that occurred at my home. I said, "No disrespect, but I do not feel it is in my best interest for you to represent me as a delegate because you have just sat in the G.O. 15 (investigative questioning) of all the officers in your command. He fully understood and stated that, "You are well within your rights not to make a statement without what you feel is proper representation." He also notified me that I was going to be suspended if I did not make a statement. I then replied, " I fully understand my rights and I am okay with that." I requested that Mr. Joe Cole call the trustee to tell him I needed the presence of a PBA lawyer. After I spoke with Officer Cole I was told by Sergeant Murray I could not leave yet even though I was not under arrest. About ten minutes later which was 5:10 p.m. I would be called into the captain's office where Captain Dipaolo, Sergeant Hellriegel, and Lieutenant Tully verbally notified me that I was suspended without pay for thirty days for failure to respect officers on the scene and for operating a daycare without a license. After the verbal

6

notification I took a livery cab back to my home where I found the provider that was caring for my grandchildren upset about the chaos that had taken place during my absence. The daycare provider informed me that after I left my home the police officers took the liberty to intrude my house and began searching. She stated, "I found it impossible to calm Darren Jr. and Serenity because of all the commotion and that I don't think I am coming back because the police officers were asking me questions I didn't feel comfortable answering. I really don't know what they were looking for, but they were taking notes about the house and then they left and the door remained opened and it was still broken." She went on to say, "I am scared because this is not safe. I have never encountered such an event in my life." At about 6:00 p.m. when the provider left I called the 070 precinct, desk officer Sergeant Lyons and explained to her that I was aware that a city involved had to be generated to get my rear kitchen door fixed. She then replied, "I will send the patrol supervisor over." Several hours later Sergeant Deighan (Shield # 3092) responded to the scene and stated that, "the landlord said he will take responsibility to fix the door." I explained to the Sergeant in the meantime that I have to sleep here alone and that my safety and security is compromised not to mention all the daycare equipment that I have that could potentially be stolen. Sergeant Deighan left the front porch of the house, walked over to his car and stated before he sat down that, "the door is as fixed as it going to be. No one is coming back here." He then got into in his patrol car and left the scene. After, the Sergeant left I called Internal Affairs Bureau to file an official complaint at 9 p.m., Log # 05305-33, about the unsecured lock on my rear kitchen door. I then communicated with officer Irizarry (shield # 15436) at IAB, this would be the first of three phone calls before I would have to call him back to find out that duty Captain Barretta would send the Emergency service Unit to repair the door. First call made to 911 at 9:15 p.m. operator # 1169. The 911 operator that connected me to IAB on the second call ID # 1612 sprint # 1885. By 2:20 a.m. emergency service unit responded to fix the door. It was not a hundred percent safe but it was in better condition at least

7

until the frame is repaired. The two responding officers were very cooperative and helpful. I took pictures as they did the temporary repair and I thanked them for their assistance and said good night.

On November 9th, 2005 upon completion of the thirty day suspension without pay or benefits. I was notified to respond to 1 Police Plaza for reinstatement. Upon arrival I was served with charges and specifications. Specifications were as follows:

1. Said Police Officer Marie Salvodon, assigned to Housing Borough Bronx/ Queens, on or about October 10, 2005, at location known to this Department, in Kings County, engaged in conduct prejudicial to the good order, efficiency and discipline of the Department in that Police Officer Salvodon did wrongfully and without just cause prevent and/or interfere with a criminal investigation in that Officer Salvodon prevented the entry of Police Officers, who were searching for burglary suspect, into an apartment where the suspect fled.

PG 203-10 Pg. #1 para. #5    PROHIBITED CONDUCT    CODE 15

2. Said Police Officer Marie Salvodon, assigned to Housing Borough Bronx/ Queens, on or about October 10, 2005, at location known to this Department, in Kings County, engaged in conduct prejudicial to the good order, efficiency and discipline of the Department in that Police Officer Salvodon, during the course of a criminal investigation, made false or misleading statements to responding Police Officers regarding a burglary suspects whereabouts, in such a manner as to impede and/or influence a criminal investigation.

PG 203-10 Pg. # 1 para. # 5    PROHIBTED CONDUCT    CODE 15

3. Said Police Officer Marie Salvodon, assigned to Housing Borough Bronx/ Queens, on or about October 10, 2005, at location known to this

8

Department, in Kings County, engaged in conduct prejudicial to the good order, efficiency and discipline of the Department in that Police Officer Salvodon neglected and failed to timely identify herself as a member of the service to police officers conducting a search for a burglary suspect.

PG 203-10 Pg. #1 para. #5     PROHIBTED CONDUCT     CODE 15

4. Said Police Officer Marie Salvodon, assigned to Housing Borough Bronx/ Queens, on or about October 10, 2005, at location known to this Department, in Kings County, was discourteous to Captain Mark DiPaolo, Patrol Borough Brooklyn South, and numerous other members of the service, in that Officer Salvodon repeatedly screamed obscenities towards said Captain and the other members of the service.

PG. 203-09 Pg.#1 para #2     PUBLIC CONTACT     CODE 20

Said Police Officer Marie Salvodon, assigned to Housing Borough Bronx/ Queens, on or about October 10, 2005, at location known to this Department, in Kings County, Having been ordered by Captain Mark DiPaolo, on three separate occasions, to respond to the 70 Precinct for further investigation into the days events, twice disobeyed said lawful order in that Officer Salvodon refused to comply.

PG 203-03 Pg. #1 para. #2     COMPLIANCE WITH ORDERS     CODE 21

The plaintiff disagrees with the charges and specifications for several reasons. Rights guaranteed to the claimant under the federal and state constitution, as well as any rights as a public employee were violated based on the fact that there was a breach in privacy, due process of the law, and equal protection under the laws. There is reason to believe that there was abuse of privileges and power

by members of the Police Department who knowingly made false statements during the course of their investigation as it pertains to the incident and subsequent events designed to induce belief that the plaintiff's conduct was incompliant. It is the claimant's intention to establish by clear and fair preponderance of evidence that the defendants conspired, both prior to and after the fact to violate substantive due process clause as it forbids arbitrary deprivation and the capricious disregard of public employee's right to life, liberty, and property. Although claimant reserves the right of the fifth amendment not to self incriminate it is without reservation she asserts the right to freedom of speech as afforded by the first amendment of the constitution, during the time of the incident in question the aggrieved proclaims that she is in fact the only party who has been wronged by the deficiencies of corruption, lies, and misconduct of the defendants. Thereby, giving rise to plaintiff's first cause of action for "wrongful" dismissal. Plaintiff will argue she was victimize as a scapegoat in order to cover up intentional, willful, abusive discretion, and bad faith malice and provocation on the part of others (defendants) involved in the matter. Thus, the second cause of action for defamation as they communicated to a third party harmful malicious (through printed) materials about the plaintiff to non-essential third parties. Consequently, plaintiff's third cause of action for violation of fourth amendment rights when defendants forcefully entered her domicile in pursuit of alleged burglary suspect. In addition, to the willful and deliberate misrepresentation and/or omission of pertinent facts created to entrap plaintiff is the direct results of the charges and specifications filed against her. Furthermore, patrol guide procedures as well as administrative procedures were breached due to the events that transpired at the plaintiff's home. Hence, due cause of action on the fact that one or more parties acted together to accomplish an unlawful discharge using unlawful means with intention of injuring the dismissed party (plaintiff). The practice to ruse plaintiff into compliance with unreasonable demands as she maintained within the scope of employment of the following defendants Sergeant Joseph Ricotta, (tax # 895904, Shield # 4750), Police Officer William Ubieta, (tax # 916828, Shield # 7859) , Police Officer Alessandro Longardino, (tax # 93394,

Shield # 10205), Police Officer Chris Ottomanelly, (tax # 930892, Shield # 17807), and Police Officer Michael White, (tax # 907749, Shield # 7579) who intentionally and recklessly intruded upon the seclusion of the public off duty employee's right to privacy as it interferes with private affairs regarding her day care. A matter she reasonably expected to keep private within the confines of her home until the process of licensure was completed in accordance to the Department of Health and Mental Hygiene regulations. A fact that would not have been made an issue by the members of the detective squad had the initial responding officers complied with rules and regulations, to knock and identify themselves as police officers. Upon which time I would use discretion based on justification provided by the officers to allow them in. The abuse of power did not stop with the initial contact with those officers at the rear kitchen door. Captain DiPaolo's presence on the scene during the course of my interaction with him added insult to injury. He overtly threatened the use of a taser upon my person if I did not agree to be taken to the 070 precinct for so-called "investigative" purposes. This threat in itself proves a substantial risk the defendant posed to not only my health but my freedom and free will. As I explained prior I suffered substantial physical injuries from a line of duty injury in May 17, 2005, I had a scheduled appointment for pre-operative medical screening for a derangement to my right shoulder. My lumbar spine could not with stand such trauma. The off duty police officer's health and well-being was of no importance to the Captain. His orders to Sergeant Simone and Sergeant Murray were sustained. As they drove me to the precinct Sergeant Simone would hold me against my will for a period of four hours and fifty minutes. I was black listed as an officer. Without legal representation, I refused to make a statement in regards to their investigation. Other than the fact that they [Sergeant Gary Hellriegel, Lieutenant Richard Tully, John Doe #1 (DET Squad), John Doe #2 (DET Squad), and Police Officer Michael White] needed to remove me from my home in order to orchestrate an illegal search of my entire home. I fail to see the significance of my presence at the 070 precinct. These tactics deficient as they may be in accordance to the law failed to protect my rights but sufficiently satisfied their pre-termination

requirements as required by either administrative or procedural laws of the department. Anti-crime team supervisor Ricotta set in motion misconduct allegations against the plaintiff resulting in claimant's dismissal, for reasons unrelated to her job performance. More over, Captain DiPaolo conspired after the fact with the assistance of Gary Hellriegel and Lieutenant Richard Tully continued to perpetrate unlawful employment practice against the plaintiff potentially setting in motion allegations which would result in a thirty day suspension without pay or benefits eventually leading to claimant's detriment. In keeping, with unfair opportunity to afford a public employee the opportunity to rebut evidence presented against her. The Department would rather dismiss her than to render the "truth" upon proper venue. The plaintiff suffered severely as a result of this injustice. The Officers never even bothered to show up in court to testify against her son on the so called "burglary charge". Yet, they want the victim to accept that the events that transpired on October 10th, 2005 was all her fault and that she should be made to suffer for exercising her rights when she questioned he legitimacy of the intrusion in her home. In spite of the fact that all the defendants mentioned above claimed they were well within their rights to exercise due diligence in hot pursuit of her son yet none of the officers appeared in court to testify against him. As a result their absence the honorable judge laughed the case out of court without prejudice on the fact that the officers never showed up to uphold their charge in alleging that plaintiff's son had committed burglary. On March 30th, 2006 the defendants succeeded in their grand scheme as the commissioner Raymond Kelly ordered the dismissal of the plaintiff from her vested employment after five years of service without reason. Plaintiff in front of her children had to suffer the degradation and humiliation of being dismissed from duty as a New York City Police Officer at her home. The honorable Commissioner decided to dismiss the plaintiff pursuant to powers vested in him by section 14-115 of the administrative code city of New York effective 24:00 hours March 30th, 2006 while plaintiff was on sick leave from the above mentioned line of duty injury. The surgical procedure performed on February 2nd, 2006 to the plaintiff to the plaintiff lumbar spine is referred to as a lumbar

laminectomy and discectomy and posterior spinal fusion with instrumentation and posterior iliac crest bone graft of the L5-S1 disc. Since the employer (NYPD) was self insured dismissal from her job left the claimant (Marie Salvodon) without any medical coverage. Since the injuries occurred while on duty status the self insured employer is liable to provide workman compensation to the employee in addition to the following remedies:

IV. Plaintiff is seeking compensatory, consequential, punitive and monetary damages in the sum of five million dollars for intentional infliction of emotional distress, false imprisonment, back pay and future loss wages, and defamation of character.

*Plaintiff*
*Marie S. Salvodon*
*01/10/07*