

UNITED STATES DISTRICT CO
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------X

MARIE SHERLY SALVODON

       Plaintiff,

    -against-

THE CITY OF NEW YORK,
THE NEW YORK CITY POLICE DEPARTMENT

        Defendants.

-----------------------------------------------------X

**AMENDED COMPLAINT**

07 CV - 17 (ENV)(LB)

**JURY TRIAL DEMANDED**

I.    Parties:

Plaintiff    Marie Sherly Salvodon    , resides at 41 Nostrand Apt. 6C Brooklyn, N.Y 11206

Defendant    Sergeant Joseph Ricotta    , resides at    070 Precinct

Defendant    Captain Mark Dipaolo    , resides at    Patrol Borough Brooklyn South

Defendant    Sergeant Robert Murray    , resides at    070 Precinct

Defendant    Sergeant Stacey Simone    , resides at    070 Precinct

Defendant    Sergeant Jane Doe    , resides at    070 Precinct

Defendant    Sergeant Edward Deighan    , resides at    070 Precinct

Defendant    Sergeant Gary Hellriegel    , resides at    Brooklyn South Investigation Unit

Defendant    Lieutenant Richard Tully    , resides at    Brooklyn South Investigation Unit

Defendant    Lieutenant Vincent Cirrito    , resides at    Integrity Control Officer 070 Precinct

Defendant  Police Officer Alessandro Longardino, resides at    070 Precinct

Defendant    Police Officer William Ubieta    , resides at    070 Precinct

Defendant    Police Officer Chris Ottomanelly,  resides at    070 Precinct

Defendant    Police Officer Michael White    , resides at    070 Precinct

Defendant    Police Officer Candace Harris  , resides at    070 Precinct

Defendant    Police Officer Burtchell    , resides at  ESU City-Wide Blood Hound

Defendant    John Doe #1 (DET Squad)    , resides at    070 Precinct

Defendant John Doe #2 (DET Squad),    reside at    070 Precinct

This is a complete list of parties known to be involved in the incidents before or after the fact, resulting in these cause of actions.

2) The Jurisdiction of the court is invoked pursuant to:

A)  Violation of public employee's rights under federal and state constitution which is actionable under civil rights act of 1871, 42 USCA § 1983 or 42 USCA § 1331.

B) Violation of civil servant's constitutional rights which does not require exhaustion of state administrative remedies before bringing a suit under U.S.C.A. Const Amends 1; 4; 5; 14; 42 U.S.C.A. § 1983.

C)  Federal Tort Claims Act (28 U.S.C. §§ 2671-80).

D) Privacy Act (5 U.S.C. § 552).

E) A claim pursuant to U.S.C.A Cons 14; 42 U.S.C. § 1985(3)

The following information is based on privileged communications between members of the 070 Pct. and the 911 Central communications operator Pertinent to 911 Sprint-out Report regarding the arrest of my son Darren Flowers at my home. Please Be aware, should this amended complaint end up in trial with the courts permission, The Sprint Report, My Charges and Specification and Rosario material will be Presented as exhibits 1, 2 and 3 for Plaintiff:

3)        According to 911 call sprint-out report # M05191, dated Monday October 10th 2005 at 1:55am members of the 070 precinct responded to a radio run of a signal 10-52 family dispute man with a knife breaking into a residence at 425 Marlborough 1st Floor _Apt_   This call originated from two different locations by two different phone callers with a previous incidents code of 1010h1, (call for help.) On line (15) of the report, a radio transmission is noted in regards to a 070 precinct sergeant's status (98) on patrol. Although this entry shows a sergeant available on patrol the identity of the sergeant is a mystery. Based on my experience as a Police Officer I believe it to be the patrol supervisor on duty that day .This information could be verified on the computerized return roll call for that day on the 2nd platoon. Besides Sergeant Ricotta, I know for sure there was at least two other sergeants on duty at the scene of the incident, their names are Sergeant Robert Murray, Sergeant Stacey Simone. Additional information shows the Ani-Ali- (location) 718-826-9374 Jean-Pierre, Josephine, 425 Marlborough road 1 floor apt. (this address belongs to the alleged complaining victim.) The next location belongs to the complaining victim's sister Elizabeth from a T-mobile cell site at 1680 east 12 Street.

3-A)        Except for male black 6ft tall no other physical description of clothing or facial characteristics were provided. Other entries show one female caller states that the male broke the front glass door and it's possibly open. One of the most significant entries is that of 070 unit sp88 92 D.I.R Prep. ("Domestic Incident Report prepared") This entry is consistent with a final disposition when an arrest of one person has been affected in regards to a domestic incident. What makes this particular entry so important is the fact

that it contradicts everything Sergeant Ricotta said was true on my departmental Charges
For example, when I examined the 911 sprint-out report I also compared   it's contents to
my son's arrest paper work and then compared those reports to my own chargers and
specification Rosario material when examined line # 27 on the 911 report clearly
demonstrate even though the report appears to be authentic, It's contents are not.
Evidently, sp88 could not have made the arrest because Sergeant Ricotta said anti-crime
team- 2 Police officer Michael White affected the arrest. I personally witnessed the
officer when he placed hand-cuffs on my son Darren for what he claimed was a burglary.
If you look closely you won't find any mention of <u>Anti-Crime Team 2</u> either, it can't be
found on the sprint because it only exist on my charges and specification Rosario material.

3-B)        Furthermore, Let's discuss why all these units mysteriously appear on the
scene without having been requested through the communications division. First the
canine unit (see lines 28-30 on sprint-out) k-9 84 present on the scene at the location at
<u>12:20</u>, then the bloodhound appear 84 present on the scene at the location at <u>12:24</u> both
show up present after the alleged perpetrator has been removed from the scene
supposedly by sp88 at <u>12:20.</u> Line # 29 makes the mention of anti-crime team-1 98 on
patrol at <u>12:22</u> after this entry desk 1 (call your command) 93 D.I.R. Prepared (domestic
incident report prepared), (61 complaint) prepared too, 12:24. One must question why
this report is so suspect, Darren told me he was transported right after A/O Michael white
placed the handcuffs on him but he did not see him again until about thirty five minutes
later because he was at my home performing the illegal search.

3-C)        More importantly, where on this 911 report can anyone find the radio
transmission from Sergeant Ricotta broadcasting the so called (10-31) burglary in
progress and the request for additional units as mentioned on my Rosario material. Of
course you will not find this anywhere on the sprint report because this only exist on my
charges and specification Rosario material. These statements were fabricated for the
benefit of Sergeant Ricotta and Captain Dipaolo as they deemed necessary to
misrepresent the facts in order to frame me while covering their own acts of misconduct.
On October 10th , I was suspended for thirty days without pay because I dared to exercise

my legal rights to free speech against their unreasonable search and seizure of my home and my person.(see*U.SC.A 4, " The right of the people to be secured in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but on probable cause, supported by oath or affirmation and particularly describing the place to be searched, the person or things to be seized." In light of the numerous charges, imposed penalties upon the civil servant there is nothing random about the employers abuse of discretion while depriving claimant of liberty or property interest. I am bringing this as my first cause of action.

3-D)        (See* U.S.C.A 1,) First Amendment rights may not be infringed regardless of procedural protection accompanying deprivation. Civil servant contends the summary suspension was imposed in bad faith because the department should have independently investigated facts before agreeing to captains recommendations and conclusion that (See* Page 4, Rosario Material)" In Conclusion, it is the opinion of the undersigned (Capt. Dipaolo) that Police Officer Marie Salvodon exhibited conduct that is deemed to be prejudicial to the good order and efficiency of this Department. The investigation into this matter has determined that officer Salvodon interfered with a Department investigation by hindering the responding officer's efforts to search for and apprehend a suspect wanted for burglary. Now (see the bottom of page 1 Rosario Material") Did Captain Dipaolo say Sgt. Ricotta told him in the G-O 15 interview When they requested that they be allowed access to the apartment to continue their search "The female became extremely combative with the officers, stating that there was no one inside the apartment but her son, and that he had been with her the entire day." Now also look at the 911 Sprint Report does anybody see any mention of a burglary. If Captain Dipaolo's defamatory statements were not disseminated through the chains of command the department would not have sufficiency of evidence (*10, bottom of page 4 on Rosario) to serve me charges or suspension. The first amendment adverse retaliation was done primarily to deter my involvement in any further grievances. I must admit before bringing this cause of action for violating my First amendment rights I was scared out of my wits. I never imagined that they would go so far to make me suffer. For the record I fear for my safety, For that reason I never bothered to do an article 78 to get my job back .I want all

members involved to know I will not make this mistake again if any of you so much as come near me or any members of my family, I will do what ever is legally necessary to protect us. All the adult members of my family have copies of these document and they have been instructed if any thing suspicious happens to me they are take these records to the attorney general's office or the justice department. For this violation of my first amendment right to free speech I bring this as the Second Cause of action.

3-E)        For the record, during the time this incident transpired Marie Salvodon was a tenured member of the NYPD, Plaintiff did have a property interest in her employment as vested union member who had a reasonable expectation treated fairly under the Collective Bargaining agreement made between the NYPD and the PBA union representing all members of the department "equally". The department advocate's office did indeed served me with charges and specification which resulted in my suspension for 30 days without pay Since a full months pay was wrongfully withheld in bad faith prior to any disciplinary action of dismissal probation I believe in all fairness to rules of binding arbitration plaintiff does have a property interest in the amount $4850. She was not allowed the opportunity to disprove the charges so preferred against her. Pursuant to New York Administrative Codes *14-115, Discipline of members,*14- 123, Suspension of members of the force. "The commissioner shall have the power to suspend, without pay, pending the trial of charges, any member of the force. If any member so suspended shall "not be convicted" by the commissioner of the charges so preferred, he or she shall be entitled to full pay from the date of suspension, notwithstanding such charges and suspension." {See New York City Administrative Charter Page*479} What about the fact that when the commissioner placed me on dismissal probation I was actually out on sick leave from injuries sustained on the line of duty, every member of this department knows the clock stops on everything until you are returned from sick leave. The failure of the department to comply with directive and procedure of judicial process does not abrogate their contractual obligation owed to Marie Salvodon under Binding arbitration agreement. As this pertain to my work condition where fair labor practice is applied in my situation. See [*Page 478-479, New York Administrative code 14-122.1(a)] Receipt of line of duty pay. A member of the force in the rank of police officer, other than an officer who is

detailed or designated as detective or who holds the position of sergeant or any position of higher rank in such force, shall be entitled pursuant to this section to the full amount of his or her regular salary for the period of any incapacity due to illness or injury incurred in the performance and discharge of duty as a member of the force, as determined by the department. ("Incapacity shall mean the inability to perform full, limited, or restricted duty.") This disability was incurred as result of an RMP accident while responding to a priority job (34) through no fault of my own. This physical disability was certified by police surgeon who approved all prior Worker's Compensation, pursuant to section (14-116,(A)New York Administrative Charter, page 474 ,Limitation of suits) Actions or proceedings, either at law or in equity, shall be commenced or maintained against the Police Department, or any member thereof, or against the commissioner, or against the mayor, or against the city by any member or officer, or former member or officer of the force or department to recover or compel the payment of any salary, pay, money or "compensation" or moneys, or any part thereof forfeited, deducted or withheld for any cause, only if such action, suit or proceedings shall be commenced within two years of action shall have accrued. My application #123 was filed with the NYPD Uniformed disability retirement unit at one Lefrak City Plaza-Room 1514 Corona, New York 11368 on 1/31/06 .Under N.Y law if the records show that a police officer's disability was the natural and proximate result of line-of-duty injuries, and thus was entitled to accidental disability retirement. Cartagena V. City of New York. (See F. Supp 2d 414 Municipal Corporations 187 (10.) One would think after almost loosing my life on the line of duty my employers would act in good faith and fair dealings by owning up to their obligations. Of course I was terminated so I never got to see the medical board. For their failure to provide worker's compensation health insurance I am bringing this as the third cause of action for pain and suffering and mental anguish.


3-F)         Captain Dipaolo (see*2 on my Rosario material) said his decision was based on Sergeant Ricotta's GO-15 interview pursuant to 206-13, "upon arrival the officers observed a male black entering the residences through a first floor window Sergeant Ricotta broadcasted a radio transmission that there was a possible (10-31) burglary in progress at the location and he requested the assistance of additional units."

Police officer Michael White and Chris Ottomnelli assigned to 070 Anti- Crime team- 2 arrived simultaneously to the Sergeant's request and immediately pursued the male through the open window. For the third time you will not find this broadcast anywhere on the 911 sprint report because it only exist on my charges. Based on my experience as a police officer, if any of these occurrences actually took place a prudent supervisor would have provided a complete description of the fleeing suspect for other responding officers. Patrol Guide procedure 212-14 requires that upon responding to the scene of a burglary if there are property damage such as those charged to Darren Flowers (criminal mischief: intent to damage property and burglary 3rd degree, criminal trespass 1st degree) the crime scene unit must be requested to take fingerprints and to do crime scene survey. Again if Sergeant Ricotta told the truth then they would have found Darren's fingerprints at the window panel in an upside down position, apparently they failed to request the crime scene unit because they knew exactly who he was from the moment they arrived on the scene. Secondly, they also accused Darren flowers of breaking the glass door on the narrative portion of the Omniform complaint and arrest reports Sergeant Ricotta personally signed and approved both reports and neither one has invoice numbers for damaged property or crime scene survey. Considering the fact that the outcome of any criminal case would have been determined by the thoroughness of the police investigating In my opinion the presentation of oral testimony and physical evidence should be beyond reproach. Apparently, they were to busy trying to entrap me to do their jobs proficiently, no wonder they could not show their faces in criminal court.

4)        These discrepancies are direct violation of patrol guide procedure and there are too many to be classified as mistakes. Patrol Guide procedure no: 203-08, "The making of false statements will result in dismissal from this department absent exceptional circumstances." Statements include, but are not necessarily limited to lying under oath during a civil, administrative or criminal proceeding "as well as during an official department interview conducted pursuant to patrol guide procedure 206-13. "Interrogation Of Members Of The Service." Exceptional circumstances will be determined by the police commissioner on case by case basis. Considering the fact that I was the only one suspended for thirty days without pay while all other members involved this case continued at their gainful employment, I guess I am the exception to the above

rules. The system could cover up these incidents as much as they want, but it will not change the fact that Commissioner Kelly's administration is full of corruption. For the departments failure to provide Due Process in the form of a fair hearing against these particular charges and specification under the 14 due process clause, I am bringing this as the fourth cause of action.

4-A)          Like many other citizens before I got on the job, I heard young black males (My children included) complaining about some New York City Police Officers frequently perform unjustifiable searches upon them, I was more inclined to believe members of this department were justified in all police actions. Now, I realize that I was wrong. This systematic problem does not only affect the young black male population. This is a city-wide problem for minority neighborhoods in general. Natasha Flowers listened very carefully as Micheal White proclaimed to her how many times they break into people, homes. "We breakdown their doors all the time and then they complaint to CCRB, We get exonerated," They went away, this one will go away too!" We are going to get her fired for disrespecting the ranks." In my opinion, if they could lie about this incident and get away with it .What will they do to the unsuspecting public, who simply does not know any better. Who is going to protect their rights since they no knowledge of what is really going on within the corrupt justice system that is the New York City Police Department. I know for a fact this is not an isolated incident, these supervisor violate the rights of their subordinates they get away with it because the system is set up to allow card blanch, they're afraid to lose their pensions so no one ever speaks up.

Since this happened the arresting officer Micheal White has been promoted to the status of Sergeant and been transferred to the 088 Pct. The sad part about his statement is the fact that it is true and I did make a complaint to Civilian Complaint Review Board in regards to the above misconduct and they were in fact exonerated. I have tried under the freedom of information act to examine the documents used to arrive at their conclusion, but the Agency Counsel Mr. Grahm Daw refused to cooperate with my request. If this agency which is independent of the New York City Police Department had nothing to hide then why do they not allow Complaining victims public access to the records. I now believe the CCRB'S Sole purpose is to provide a front to mislead the

unsuspecting victims into believe their Civilian complaints will be objectively investigated when they are not. This is obviously a conflict of the public's interest, trust. Speaking of public's interest the day this incident took place Captain Dipaolo Mark gave me a verbal notification that I was suspended in the presence of Lieutenant Richard Tully, Sergeant Gary Hellriegel, He said it was because I was disrespectful to the police officers on the scene and for running an illegal Day Care in my home. To my knowledge they disrespected me first. Secondly, if they had not broken into my home under false pretences none of this would have happen and they would not have seen my private affairs. I did not have any first hand knowledge of the occurrences mentioned on the above 911 sprint report prior to their forcible entry into my home I was not aware of the facts leading to the arrest I didn't contradict their statements, their own actions brought them to this point. Although, this sprint report gives partial picture of what transpired it does not explain the order of things nor does it substantiate the facts as they claimed it. The audio 911 tape is one the supporting document to the sprint report which can clearly set the pace of events without a doubt. Once heard the unidentified Sergeant's identity will be known by voice analysis. Natasha and her sisters all know that when the arrest was made it was prior to Captain Dipaolo's the 12:25 Radio broadcast (See line *31 on 911 sprint-out) and my charges Rosario Material*2 Top of the page.) "Auth of Duty Capt Crime Units to come out of location." *This Transmission was done after Darren's arrest and this is first of many lies told by Capt. Dipaolo the under the color of law. There was never any need to set up a perimeter I was not in danger and they knew it, remember there is only one crime team unit mentioned on the sprint. To set this time line I have already written a total of 24 pages, Included with this Amended Complaint you will also receive copies of the 911 Sprint-out report, the Charges and Specification with Rosario Material. Anything else mentioned could or will provide by the department upon discovery.

**WITNESS TESTIMONY**

4-B)          The following information has been added in order to provide a more accurate account of what transpired in accordance to the eye witness testimony; "Upon arrival at the scene of a (10-52) family dispute, Sergeant Ricotta along with anti-crime members were seen in the backyard discussing the 911 call with complaint Natasha

Flowers (wife of Darren Flowers). Plain clothes officers listened carefully while the elleged complaining victim told them "He is upstairs with his mother, she rents the 2nd floor apartment from my father" and she is a New York City police officer. He specifically remembers observing one of the shorter fat male white, possibly Hispanic making references to a previous incident when he responded on a previous domestic violence incident regarding her niece, "yeah her weapon was removed." At that point once her job status was confirmed all the officers drew their weapons and Natasha asked "why are you drawing your weapons, I told you she is a cop just like you". They looked at her and stated "yes but we don't know if she has another weapon," that's when Natasha told them "she is modified she does not have her gun." After being notified of the above information Sergeant Joseph Ricotta, (tax # 895904, Shield # 4750), along with Police Officer's William Ubieta, (tax # 916828, Shield # 7859), Alessandro Longardino, (tax # 93394, Shield # 10205), Chris Ottomanelly, (tax # 930892, Shield # 17807), and Michael White, (tax # 907749, Shield # 7579) conducted a group meeting in the presences of Natasha and her sisters Phenia and Emma standing about 6 feet away. Sergeant Ricotta then asked Natasha's permission to breakdown the door. While these officers were fully aware of the consequences of their actions they proceeded up the spiral staircase leading to the second floor apartment of Marie Salvodon, without knocking they simply broke down the door.

4-C)    When confronted by the off duty Police Officer Marie Salvodon as to why they broke her door. The officers claimed, "We are in pursuit of a fleeing burglary suspect from the first floor apartment we must come." These Plain clothes police officers that were later identified to me by Sergeant Stacey Simone at the 070 precinct upon my suspension. They never identified themselves they never provided a search or arrest warrant prior to the unreasonable search and seizure of my home. Because I knew I was well within my rights under the fourth amendment to be secured in my home against warrantless and nonconsensual entry I exercised my rights to speak freely in regards to the validity of their entry and I was severely punished for acting on legal my rights as an off duty police officer. Absent the exigent circumstances revolving around the fleeing burglary suspect the Anti-Crime team had no choice but to rationalize their actions (see

(*2 on my Rosario Material) by claiming a hostage situation." Fearing that the occupant of that apartment may be harmed by the suspect that was being pursued, a decision was made that the apartment door would be forcibly opened. After partially gaining entry to the apartment, the officers were met by a female who prevented their further entry into the apartment. Sergeant Ricotta explained to the female that they were searching for a burglary suspect, and request that they be allowed access to the apartment to continue their search. First and foremost, they never requested anything it was a demand. If this was a actual hostage situation where a hostage taker (Darren Flowers) was contained in the apartment segregated from other people the proper procedure according Patrol Guide 212-38 would be to establish an (outer perimeter) an area sufficiently removed from the actual scene of the incident to ensure safety to all spectators, including the media. Maintain the inner (frozen zone) perimeter encompassing the incident location while awaiting responding units. All requests for response of Patrol Supervisor, ESU, and Hostage Team must be done through the communication unit. Once all officers have taken cover they can attempt to isolate and contain the subject and hostages. Supervisor in charge must be cognizant of "mass reflexive response" and immediately maintain firearms control. Only then can they establish dialogue with the subject awaiting the arrival of specialized personnel. They must avoid actions that might agitate or provoke the subject, refrain from any action that would unnecessarily jeopardize the safety of the hostages. Considering the reckless way this situation was handled if this was a real hostage situation Sergeant Ricotta and his anti-crime team had just placed Marie and her family at substantial and unjustifiable risk of serious physical injury and possibly even death. The anti-crime team knew from the moment they arrived that Darren never posed any threat to me his Mother .They never saw him on the first floor because he was never there.

4-D)        They came to arrest on an order of protection based on allegations made by his wife. How or what ever the case may have been when the acted under the color of law to break into my home without giving me the benefit of doubt they became criminals too. It is no longer about Darren guilt or innocence. They made me the guilty party and they convicted without due process of the law. This case is about them placing me in a

position where I felt I had no other choice, but to defend myself .I work in the same police department as those cops and they had full knowledge of that fact did they once stop to think of what the remafication of their action cost me. They were so determined to arrest Darren they were willing to violate the law so long as they got their man. In so doing, they not only violated my rights they perpetrated fraud of additional charges with regards to Darren's arrest so they could serve me with Charges and Specifications. I was made guilty automatically as soon as they heard I was modified .What ever happened to the presumption of innocence until proven guilty. For defamation of my character and for wrongfully accusing me of criminal charges without ever letting me have a chance to face my accusers. I bring the fifth course of action under the fifth and the fourteenth amendment for not allowing me due process of the law and equal protection under the law.

4-E)          Am I not entitled to the same legal process as any accused person to face my accuser. The judicial system has been enacted to protect the rights of all citizens, whether or not the police department is willing to give consideration to appeals of fairness equal rights provides constitutional guarantees  embodied in the fourteenth amendment which has been interpreted "No State shall deny to any person within its jurisdiction the EQUAL PROTECTION OF THE LAW. They knew they never had my permission to enter any part of my home at any time to perform search. Consent must be given voluntarily by the person who has control and authority. The Police are forbidden by law from entering the home of a third party to in order to make an arrest of another. Even if Natasha was my welcomed guest which "she was not," they still could not act upon her consent because she was downstairs in the back yard not in my presence. They should have known better as supervisors,{volume. 10 no.2 of the Legal Division Bulletin From The Office Of The Deputy Commissioners –Legal Matters Page 163-164}She told them she was the daughter of the Landlord obviously she had no rights to act on any capacity. I was home I had custody because every month I paid $1500 a month to live there and that was the problem between Natasha Flowers and myself. I rented the apartment from her parents and she declaired war on me because I told her she could no longer live upstairs. That is after I found out the reason why my weapon was taken away,

she made false allegations against me when I made complaints against her father my landlord in regards to the rental conditions. These problems were being handled in the proper venue of landlord tenant court without Natasha's involvement. This was not all her fault After she witnesses how my own counterparts were out to get me fired for disrespecting them she decided she was going to speed up the process by helping them,

4-F        Lieutenant Richard Tully and Sergeant Gary Hellriegel first became aware of my situation when I asked Natasha, Darren Flowers and my niece Taniesha to move out as soon as possible. They are all lazy teenagers who refuse to work and they expect me to work, risk my life at a job which does not appreciate me so they could be supported financially. Well I did not think this was fair. After Natasha convinced my niece to call the cops, when the Officers arrived they threatened to arrest them next thing I know my weapon and my shield were taken away and I was modified, pending The internal affairs investigation conducted by {The Brooklyn South Investigation Unit} Lieutenant Tully and Sergeant Hellriegel approved the removal of my weapons without ever substantiate her allegations at that time the PBA delegate told me not to speak until the GO-15 interview was conducted. Both of them were later present during the GO-15 interview and they knew about the landlord tenant dispute between us. I had to actually evict my own son in order to get rid of her. At first I felt bad because of my grandchildren and Darren (my son) did not have any other shelter, so I let him back in. Natasha Flowers did not agree and she became such a nuisance, I had to take measures to protect myself from all the other allegations that she made. Each time she called the Brooklyn South Investigations Unit, they entertained her after a while she believed they were in fact helping her to as she said, "Screw me over for disrespecting their ranks." My son Darren and I taped confession of her dealing with the 070 pct. Her goal was to make me look like a menace to society .They negligently played right into her hands. Every time she called they showed up at my home demanding to come in as if they paid my rent; Their unreasonable invasion started to take a toll on me I started to experience anxiety attacks. I was already suffering from neck back and shoulder injuries from the RMP accident when I could no longer handle the pain and suffering and the burden of emotional distress I reached out to a therapist she diagnosed that I suffered from acute stress disorder.

5          In early December After recouparating from my right shoulder surgery I decided this is not going to work so I planned to move Natasha's father, my landlord agreed upon a stipulation in landlord tenant court that he would pay me $2,5000 and would I moved by the next court date the judge approved,but she when she got home to find out about the agreement she got very angry Stating "You Fucking Bitch am never going to let it happen",  she called the police. We made cross complaints against each other in regards to the landlord tenant issues while I was standing on the top of the stairs in my hallway I over heard the responding Sergeant, Gerard Castiglione telling her to go and apply for an order of protection against me. The next day when I called the 070 pct. for my complaint number the report was missing, but Natasha's was available. She would later use this report at family court just as the Sergeant suggested to obtain a temporary order of protection against me, pending the next court date (February 1, 2006). It forbids certain behavior but she did not get what she had intended, which was to exclude me from my home. She used police jargon in all her complaints as if someone was feeding the words to her, but ask her to define the legal meaning of her allegations she could not tell you what they meant. Both Natasha Flowers and her father testified in court that the 070 staff members told her to lock me out of the apartment because, "I was going to kill her." I really do believe they did have her acting as their agent to get me fired .However, my police training specifically states we are not to interfere with landlord tenant issues which are civil in nature. We could only refer the complainants to landlord/tenant court.

5-A)          Sergeant Catiglione was negligent when he advised her of this information. Section *14-141, Page 508-New York Administrative code : Common law and Statutory powers of constable. "The members of the force while on duty in the city and whenever in any other part of the state, shall posses all the common law and statutory powers of the constable, EXCEPT FOR THE SERVICE OF CIVIL PROCESS, and any warrant for search or arrest, issued by any judge of the state may be executed in any part thereof, by any member of the force. Police Department handbook Title 14-134, Civil Process: A police officer while actually on duty SHALL NOT BE LIABLE to arrest on civil process, or to service of subpoena from civil court. I was as a result of his negligence. Her report against me clearly states "I did not want her or her sisters on my floor but she kept

coming back to be with my son. When an Officer becomes aware of a matter that is of civil nature he or she must handle the situation with caution .The only decision to be made is a referral to Landlord / Tenant court. Look at my arrest paperwork.

5-B          On January 21 After Throwing a hot Iron at me Natasha Flowers had me arrested from my own home based on her false allegations/of Criminal Contempt to responding Sgt. Kraemer. It was history repeating itself, when those other members told me they were going to get me kicked out of there .I did not believe they would have ever gotten away with it. Well they got their wish. Sgt Edward Kraemer walked up the stairs after Natasha let him in without a search or arrest warrant he simply told me "let's Go," you must respond to the 070 Pct. My 16 year old nephew who was with me at the time was dragged along with me. He was not placed under arrest, but he became a child in need of shelter because I was placed under arrest, by patrol Sgt. Kraemer who informed that it was due to "higher authority" I never spoke to nor did I see this higher authority. After my arraignment at Central Bookings, my attorney provided the discovery information. The Omniform Complaint has a Lt. Mascol written as the person who input the report into the system. Sgt. Edward Kraemer Tax #: 917834 is the Approving/ Supervisor, Sgt. Gerard Castigli Tax #: 922086  070 Pct{ written as seen shown on arrest paperwork } is shown as the Reporting /investigating member of the Service. Unlike before this time I was kept   in full view of the precinct on the first floor so every member who walked by could see me. My nephew was taken to my father's house, while I remained under custody of the 070 pct. for "Three whole Tours until the next morning when they transferred me to Central Bookings", where I was issued a criminal court order of protection which now prohibits me from going to my home. Before my transport to Brooklyn Central Bookings, at one point during the first platoon Sergeant Deighan from the previous incident paid me a visit so he could have a good laugh at my expense. I remained on that hard bench with no medication suffering from a herniated disk and no one bothered to provide medical attention when I requested. Every prisoner who is or becomes ill while in police custody must be taken to the hospital, hospitalized/Prisoner form must be done upon request. If Corporation Counsel still believes I do not have a claim of under the 14th amend to sustain due process. The fact that I was denied my

freedom, liberty interest based on false allegations, which they claimed, "Ordering the defendant to stay away from the informant's home and to refrain from assaulting, harassing, menacing, intimidating or threatened the informant." First, the order does not say I had to stay away from my home and they knew she was the one in the wrong place by refusing to leave my apartment. This fact was document on Landlord/tenant afirdavid of stipulation which shown to sergeant Kraemer but he refused to eknowledge. My nephew Stephen Salvodon who was also present at my home told them truth 3 times that I was not the primary aggressor and they ignored him. Patrol guide 208-38 requires that responding M.O.S to perform a primary aggressor analysis before taking Police action, the mere presentation of an order of protection along with an unsupported allegation does not constitute grounds to take person into custody. Responding officers are obligated to investigate the circumstances surrounding the accusation to determine if there is probable cause to believe the order has been violated. See also (Vol. 16 no.3 page 249 -252 Legal Bureau Bulletin: Orders of Protection and Family Offences. After this arrest I was locked out of my home and evicted by order of protection. Another 30 day suspension with no pay soon followed. This time they did not give charges, but they still owe $4850 pay withheld due to suspension. I am entitled to it just as before because I was not convicted in any court of law. As you already know I was dismissed although I was never convicted of any crime in any court of law. Raymond Kelly and his officers failed to provide me with equal protection under the law and that is why this went so far. If he had dealt with everybody accordingly in the interest of fairness these incidents would have never taken place. My rights were violated while I was off duty as a private citizen, he received the same defamatory corresponding documents from these officers who were maliciously prosecuting me while commissioner Kelly negligently failed to do anything about it. After terminating me from my gainful employment they made sure these defamatory allegations which were never proven continued through the Department Citywide Administrative Services who then disseminated them over to the New York State Department of Labor. I am bring the sixth cause of action, as a result of false imprisonment misconduct claimed against me and line of duty illness I was initially disqualified from collecting Unemployment Insurance benefits. Statement made by Commissioner Raymond W. Kelly's upon placing me on dismissal probation,

"Respondent Salvodon's belligerence, discourtesies and confrontational actions over the course of time bespeaks of an insubordinate and disingenuous demeanor which is unacceptable within our para-military organization." Taken concomitantly with a review of her overall performance history with the department, a greater discipline penalty is merited. I have only two things to say to him in regards to his statement.

5-C        Is the Law not applicable to you and those officers who violated my rights? The very fact that the corporation counsel is defending any of these officers under the General Municipal Law, Section 50-K strongly suggests that I am right about every assertion that I have made because if they were not indemnified by the police department they would have their own attorneys to defend them during this court proceeding.

   *PLEASE TAKE NOTICE EVERYTHING ABOVE ARE BASED ON POLICE DEPARTMENT PROCEDURE, MY PROFESSIONAL OPINION, AND ADMINISTRATIVE PROCEDURES.

   *FROM THIS POINT ON EVERYTHING YOU READ IS MY VERSION OF THE STORY. I STRONGLY AFFIRM TO THE BEST OF MY KNOWLEDGE THAT THIS IS THE TRUTH.

5-D        These plain clothes police officers were identified to me after the fact my version of the story as I know it occurred on the 10th of October is written as followed. The following anti- crime officers and Sergeant did not knock; they did not provide verbal police identification prior to or after the forceful entry of my residence. As they stood in the threshold of my door huddled together arm and arm, the tallest of the officers (the sergeant) made this statement to me, "we are responding to a burglary in the first floor apartment window, we need to come in to do a search!" When I proceeded to question them as to why my door was broken down one of the white male officers said, "Get the Fuck out of the way we need to come in!" While making fervent movement towards me I then replied, "I live here and there is no burglar in my apartment and who are you?" Then, one of the shorter Caucasian male officers along with the tall African

American male officer simultaneously stated, "We received a call saying someone broke into a window on the first floor (It sounded as though their statement was rehearsed, but none of the officers knew who was suppose say that statement first." Then, I went on to say to the officers, "I did not call for help so I would like an explanation for why you broke my door without as much as a verbal identification as police officers on a scene." I went on to tell the officers as they continued to forcibly enter further into my apartment that I was on the job as a police officer and you cannot enter my home without a warrant because I know my rights. So, please call your duty captain and have him respond here because a city involved has to be done for the broken door which has to be fixed and I have a complaint to file." At this point in time, the sergeant threatened me by saying, "This is an illegal attic apartment and we are going to get you kicked out of here, so get out of our way!" As I requested for the sergeant to call central and have a duty captain respond to the scene the officers preceded to retreat down the back spiral staircase. As I attempted to push close what was left of my door the sergeant again tried to belittle me by ostracizing my Haitian accent saying, "yang, yang, yang...you're going to get a clue we are running shit here." They all began to laugh. I adamantly replied, "Unless you can justify the real reason why you violated my fourth amendment rights get away from my door!" At this time I pushed the door as much as possible but it was unable to lock so it remained opened. Still unable to identify these plain clothes officers by name or badge numbers I feared for the safety of myself, my infant grandchildren, childcare provider, and my sons who was on the premises. Within the minute I walked over to the front of the house to the living room to see if the plain clothes officers had left the premises, that's when I noticed at least a dozen or so uniformed as well as plain clothes officers in front of the house. In the middle of the crowd one officer dressed in a white shirt stood out to me. By his uniformed attire I recognized him to be a boss. I saw the plain clothes officers that were in my kitchen have a brief discussion with this supervisor. I was surprised that he got to the location as quickly as he did. It is my professional opinion that he must have been on the scene already. As I grabbed my bag and proceeded to go down the front stairs with my identification card on my left hand he walked up the stairs of the front porch meeting me three quarters of the way leading up to my apartment. He identified himself as duty Captain Mark Dipaolo and I handed him my police

identification card and identified myself as a police officer. He took the card from my left hand with his right he looked at it briefly and he held onto it. As we conversed he excused himself and stepped outside. He spoke briefly with someone that was out of my sight. I believe it to be one of the men who threaten me at my back door because he would return a few seconds later to speak of the same burglary suspect without identifying the alleged burglary suspect whom they were seeking. For the second time he would excuse himself again only to return and question me about my three children. When he asked, "How many children I had?" I replied "Three." And when he asked, "How old were they?" I replied again, "Twenty, Nineteen, and Sixteen years old." Then I went on to say, "What do my children have to do with those cops breaking an entering into my apartment and this burglary?" I also went on to elaborate on the fact that I am the legal tenant of the second floor apartment. As he held the card in his hand he would excuse himself for the third time, upon his return he specifically asked me, "Where is Darren Flowers your nineteen year old son?" This time he would remain three steps below the stairs and requested my cooperation in getting my son to answer some question in regards to the burglary. While I was speaking to the captain officer Candice Harris stood between the two doors holding my door open. She asked me if I had a daycare. I did not respond, but she continued to look around. When I asked her unlocked the front door for her she replied, "The complaining victim." Because of the manner this situation was approached by the first responders to the scene I felt uncomfortable about letting them enter my home, but nonetheless, I made every effort to cooperate with the Captain Dipaolo provided that certain safety precautions were met. Furthermore, I explained to him that I had infant children under the age of three in the household and I would appreciate it if he and one of his uniformed officers accompany me up the front stairway leading to Darren's bedroom with no casualties. One ESU officer later identified as PO Burtchell along with Captain Dipaolo accompanied me to the bedroom where I directed Darren to come out of the room to answer some questions. I accompanied Darren hand in hand down the front stairway while Captain Dipaolo and the unnamed officer followed. As Darren and I approached the front door I released him and he was placed under arrest by anti- crime team officer Michael White. As Officer Michael White placed handcuffs on Darren's wrists. Darren asked, "What am I being arrested for?" Officer Michael

White then replied, "Burglary." And no further statements were made by the officer. After Darren was removed in a patrol car by two other officers from the scene at approximately 12:10 p.m. Captain Dipaolo called all the first responding officers to the side and spoke for about two minutes among themselves. I personally witnessed this and they moved away from me. At which point Captain Dipaolo would personally order me removed from the scene by means of a verbal threat of taser by an ESU member if I did not go to the 070 precinct. I was then driven by above mentioned Sergeants Robert Murray and Stacey Simone via the 070 precinct radio motor patrol car. I would remain there in the CPU unit in the basement from the time of arrival at 12:20 p.m. to 5:00 p.m., held against my will by Sergeant Stacey Simone. I knew I was not free to leave due to the fact that I called my son to bring me food and medication to the 070 precinct the sergeant Simone refused to allow him the visit. The two times Sergeant Simone left the room she was replaced by an unidentified Caucasian female (possibly Hispanic/White) sergeant in plain clothes for a hour when she went to meal and when my son came to bring food at about 2:30 p.m. He called me by cell phone before he left the precinct and identified a blond female Sergeant fitting the description of Sergeant Simone. She told him I could not have any visitors and that I was not free to leave. Also, when I went to the rest room I was accompanied by the officer like a prisoner each time she stood in front of the door like I am a prisoner under supervision. This wrongful imprisonment made me feel extremely uncomfortable. I did not break any penal law, why were they treating me this way? It was not until I received the charges and specification did I realize the severity of the situation; they accused me of obstructing governmental administration by claiming I interfered with their police action. The alleged investigation about the burglary quickly became official misconduct by these police officers who intentionally inflict emotional distress on me as I was denied my medication, food, and my very freedom for a period of time that if any reasonable person were put in my place they would believe they were under arrest too. The only thing they did not do was read me my rights, but they certainly wanted me to speak on the matter without proper representation. Upon my arrival to the precinct I have not yet had breakfast when I was getting ready to go to the hospital for an old line of duty pre-operative blood screening for my right shoulder impingement which was severely damaged from a car accident in a patrol car, on 5/17/05. Additionally, I am

Sergeant Simone if I was under arrest and if so I want a PBA attorney. She acknowledged by looking at me but she did not reply. Sergeant Murray walked in shortly thereafter and they would convene outside CPU office for a brief period of time. At the end of the conversation Sergeant Murray re-entered the room and he notified me that the 070 precinct PBA delegate requested my presence up stairs. At this time I was also concerned about my son's safety and well being because I was unaware of his where about, after all this is the 070 precinct. As I sat down at the conference table in what appeared to be an arrest processing room with Mr. Joe Cole whom spoke to me briefly in a very professional manner about possibly making an official statement in regards to the incident that occurred at my home. I said, "No disrespect, but I do not feel it is in my best interest for you to represent me as a delegate because you have just sat in the G.O. 15 (investigative questioning) of all the officers in your command. He fully understood and stated that, "You are well within your rights not to make a statement without what you feel is proper representation." He also notified me that I was going to be suspended if I did not make a statement. Patrol Guard Procedure states that a person has two full days to be notified before making any statements or GO-15 interview, so I willfully declined. I then replied, "I fully understand my rights and I am okay with that." I requested that Mr. Joe Cole call the trustee to tell him I needed the presence of a PBA lawyer. After I spoke with Officer Cole I was told by Sergeant Murray I could not leave yet even though I was not under arrest. About ten minutes later which was 5:10 p.m. I would be called into the captain's office where Captain Dipaolo, Sergeant Hellriegel, and Lieutenant Tully verbally notified me that I was suspended without pay for thirty days for failure to respect officers on the scene and for operating a daycare without a license. After the verbal notification I took a livery cab back to my home where I found the provider that was caring for my grandchildren upset about the chaos that had taken place during my absence. The daycare provider informed me that after I left my home the police officers took the liberty to intrude upon the privacy of my home and began searching all over the place. She stated, "I found it impossible to calm Darren Jr. and Serenity because of all the

commotion and that I don't think I am coming back because the police officers were asking me questions I didn't feel comfortable answering. I really don't know what they were looking for, but they were taking notes about the house regarding the day care equipment, then they left and the door remained opened and it was still broken." She went on to say, "I am scared because this is not safe for anybody." She also said "I have never encountered such an event in my life." At about 6:00 p.m. when the provider left I called the 070 precinct, desk officer Sergeant Lyons and explained to her that I was aware that a city involved had to be generated to get my rear kitchen door fixed. She then replied, "I will send the patrol supervisor over." Several hours later Sergeant Deighan (Shield # 3092) responded to the scene and stated that, "the landlord said he will take responsibility to fix the door." I explained to the Sergeant in the meantime that I have to sleep here alone and that my safety and security is compromised not to mention all the daycare equipment that I have that could potentially be stolen. Sergeant Deighan left the front porch of the house, walked over to his car and stated before he sat down that, "the door is as fixed as it going to be. No one is coming back here." He then got into in his patrol car and left the scene. After, the Sergeant left I called Internal Affairs Bureau to file an official complaint at 9 p.m., Log # 05305-33, about the unsecured lock on my rear kitchen door. I then communicated with officer Irizarry (shield # 15436) at IAB, this would be the first of three phone calls before I would have to call him back to find out that duty Captain Barretta would send the Emergency service Unit to repair the door. First call made to 911 at 9:15 p.m. operator # 1169. The 911 operator that connected me to IAB on the second call ID # 1612 sprint # 1885. By 2:20 a.m. emergency service unit responded to fix the door. It was not a hundred percent safe but it was in better condition at least until the frame is repaired. The two responding officers were very cooperative and helpful. I took pictures as they did the temporary repair and I thanked them for their assistance and said good night.

On November 9th, 2005 upon completion of the thirty day suspension without pay or benefits. I was notified to respond to 1 Police Plaza for reinstatement. Upon arrival I was served with charges and specifications. Specifications were as follows:

1. Said Police Officer Marie Salvodon, assigned to Housing Borough Bronx/ Queens, on or about October 10, 2005, at location known to this Department, in Kings County, engaged in conduct prejudicial to the good order, efficiency and discipline of the Department in that Police Officer Salvodon did wrongfully and without just cause prevent and/or interfere with a criminal investigation in that Officer Salvodon prevented the entry of Police Officers, who were searching for burglary suspect, into an apartment where the suspect fled.

PG 203-10 Pg. #1 para. #5   PROHIBITED CONDUCT        CODE 15

2. Said Police Officer Marie Salvodon, assigned to Housing Borough Bronx/ Queens, on or about October 10, 2005, at location known to this Department, in Kings County, engaged in conduct prejudicial to the good order, efficiency and discipline of the Department in that Police Officer Salvodon, during the course of a criminal investigation, made false or misleading statements to responding Police Officers regarding a burglary suspects whereabouts, in such a manner as to impede and/or influence a criminal investigation.

PG 203-10 Pg. # 1 para. # 5         PROHIBTED CONDUCT    CODE 15

3. Said Police Officer Marie Salvodon, assigned to Housing Borough Bronx/ Queens, on or about October 10, 2005, at location known to this Department, in Kings County, engaged in conduct prejudicial to the good order, efficiency and discipline of the Department in that Police Officer Salvodon neglected and failed to timely identify herself as a member of the service to police officers conducting a search for a burglary suspect.

PG 203-10 Pg. #1 para. #5    PROHIBTED CONDUCT          CODE 15

4. Said Police Officer Marie Salvodon, assigned to Housing Borough Bronx/ Queens, on or about October 10, 2005, at location known to this Department, in Kings County, was discourteous to Captain Mark Dipaolo, Patrol Borough Brooklyn South, and numerous other members of the service, in that Officer Salvodon repeatedly screamed obscenities towards said Captain and the other members of the service.

PG. 203-09 Pg.#1 para #2          PUBLIC CONTACT          CODE 20

5. Said Police Officer Marie Salvodon, assigned to Housing Borough Bronx/ Queens, on or about October 10, 2005, at location known to this Department, in Kings County, Having been ordered by Captain Mark Dipaolo, on three separate occasions, to respond to the 70 Precinct for further investigation into the days events, twice disobeyed said lawful order in that Officer Salvodon refused to comply.

PG 203-03 Pg. #1 para. #2     COMPLIANCE WITH ORDERS      CODE 21

6.     The plaintiff disagrees with the charges and specifications for several reasons. Rights guaranteed to the claimant under the federal and state constitution, as well as any rights as a public employee were violated based on the fact that there was a breach in privacy, lack of due process of the law, and equal protection under the laws. There is reason to believe that there was abuse of privileges and power by members of the Police Department who knowingly made false statements during the course of their investigation (see charges and specification Rosario Material) as it pertains to the incident and subsequent events designed to induce belief that the plaintiff's conduct was incompliant. It is the claimant's intention to establish by clear and fair preponderance of evidence that the defendants conspired, both prior to and after the fact to violate substantive due process clause as it forbids arbitrary deprivation and the capricious disregard of

public employee's right to life, liberty, property, and freedom.  Although claimant reserves the right of the fifth amendment not to self incriminate it is without reservation she asserts the right to freedom of speech as afforded by the first amendment of the constitution, during the time of the incident in question the aggrieved proclaims that she is in fact the only party who has been wronged by the deficiencies of corruption, lies, and misconduct of the defendants. Thereby, giving rise to plaintiff's sixth cause of action for "wrongful" dismissal. Plaintiff will argue she was victimize as a scapegoat in order to cover up intentional, willful, abusive of discretion, and bad faith malice and provocation on the part of defendants involved in the matter. They should be held accountable for defamation as they communicated to a third party harmful malicious (through printed) materials about the plaintiff to non-essential third parties. Defendants forcefully entered her domicile in pursuit of alleged burglary suspect whom they knew to be her son, but they never told the plaintiff that her son was the person they were seeking. Under police procedure this is in fact entrapment.  In addition, to the willful and deliberate misrepresentation and/or omission of pertinent facts created to entrap plaintiff is the direct results of the charges and specifications filed against her. Furthermore, patrol guide procedures as well as administrative procedures were breached due to the events that transpired at the plaintiff's home. Hence, due cause of action on the fact that one or more parties acted together to accomplish an unlawful discharge using unlawful means with intention of injuring the dismissed party (plaintiff) while acting under the color of law. The practice to ruse plaintiff into compliance with unreasonable demands as she maintained within the scope of employment of the following defendants Sergeant Joseph Ricotta, (tax # 895904, Shield # 4750), Police Officer William Ubieta, (tax # 916828, Shield # 7859) , Police Officer Alessandro Longardino, (tax # 93394, Shield # 10205), Police Officer Chris Ottomanelly, (tax # 930892, Shield # 17807), and Police Officer Michael White, (tax # 907749, Shield # 7579) who intentionally and recklessly intruded upon the seclusion of the off duty civil servants right to privacy as it interferes with private affairs regarding her day care. A matter she reasonably expected to keep private within the confines of her home

until the process of licensure was completed in accordance to the Department of Health and Mental Hygiene regulations. A fact that would not have been made an issue if the members of the so-called detective squad had not conducted a canvas in her home. The initial responding officers incompliance with rules and regulations, to knock and identify themselves as police officers at the front door before taking any actions under the color of law. Upon which time I would use discretion based on justification provided by the officers to allow them in. The abuse of power did not stop with the initial contact with those officers at the rear kitchen door. Captain Dipole's presence on the scene during the course of my interaction with him added insult to injury. He overtly threatened bodily injury to my person "I will have ESU tase you if you do not go with Sergeant Murray." for so-called "investigative" purposes. This threat in itself proves unjustifiable and substantial reckless behavior displayed by the defendant; when any one person uses a threat to remove another from one place to another and keeps them against their will without legal justification, even if the person agrees and does not speak on the matter because they are scared of the threat placed upon them, it is illegal and it is called coercion, abusive authority, a violation of fourth amendment rights, unreasonable seizure of a person. This is a risk the defendant posed not only on my health but my freedom and free will. As I explained prior I suffered substantial physical injuries from a line of duty injury on May 17, 2005, I had a scheduled appointment for pre-operative medical screening for a derangement to my right shoulder. My lumbar spine could not with stand such trauma. The off duty police officer's health and well-being was of no importance to the Captain. His orders to Sergeant Simone and Sergeant Murray were sustained. As they drove me to the precinct Sergeant Simone held me against my will for a period of four hours and fifty minutes. I was black listed as an officer. Without legal representation or justification, I refused to make a statement in regards to their investigation and that is my right as afforded by the Fifth Amendment. Other than the fact that they [Sergeant Gary Hellriegel, Lieutenant Richard Tully, John Doe #1 (DET Squad), John Doe #2 (DET Squad), and Police Officer Michael White] needed to remove me from my home in order to orchestrate an illegal search of

my entire home. I fail to see the significance of my presence at the 070 precinct.
These tactics deficient as they may be in accordance to the law failed to protect
my rights but sufficiently satisfied their pre-termination requirements as required
by either administrative or procedural laws of the department. Anti-crime team
supervisor Ricotta set in motion misconduct allegations against the plaintiff
resulting in claimant's dismissal, for reasons unrelated to her job performance.
More over, Captain Dipaolo conspired after the fact with the assistance of Gary
Hellriegel and Lieutenant Richard Tully continued to perpetrate unlawful
employment practice against the plaintiff potentially setting in motion allegations
which were slanderous in nature resulting in a thirty day suspension without pay
or benefits eventually leading to claimant's detriment. In keeping, with unfair
labor practice to afford the off duty civil servant the opportunity to rebut evidence
presented against her. They are liable for the wrong action taken against Marie
Salvodon. The Department would rather dismiss her than to render the "truth"
upon proper venue of any court. The plaintiff suffered severely as a result of this
injustice. The Officers never even bothered to show up in court to testify against
her son on the so called "burglary charge." In essence he was victimized too by
their actions. They want the victim to accept that the events that transpired on
October 10th, 2005 was all her fault and that she should be made to suffer for
exercising her rights when she questioned the legitimacy of the intrusion in her
home. In spite of the fact that all the defendants mentioned above claimed they
were well within their rights to exercise due diligence in hot pursuit of her son yet
none of the officers appeared in court to testify against him. As a result their
absence the honorable judge laughed the case out of court with prejudice on the
fact that the officers never showed up to uphold their charge in alleging that
plaintiff's son had committed burglary. On March 30th, 2006 the defendant's
succeeded in their grand scheme as the commissioner Raymond W. Kelly ordered
the dismissal of the plaintiff from her vested employment after five years of
service without reason. Plaintiff in front of her children had to suffer the
degradation and humiliation of being dismissed from duty as a New York City
Police Officer at her home. The honorable Commissioner decided to dismiss the

plaintiff pursuant to powers vested in him by section 14-115 of the administrative code city of New York effective 24:00 hours March 30th, 2006 while plaintiff was on sick leave from the above mentioned line of duty injury. The surgical procedure performed on February 2nd, 2006 to the plaintiff's lumbar spine is referred to as a lumbar laminectomy and discectomy and posterior spinal fusion with instrumentation and posterior iliac crest bone graft of the L5-S1 disc. Since the employer (NYPD) was self insured dismissal from her job left the claimant (Marie Salvodon) without any medical coverage. Since the injuries occurred while on duty status through no fault of her own, the self insured employer is liable to provide workman compensation to the employee in addition to the following remedies:

II.    Plaintiff is seeking Compensatory damage in the amount of $1 million dollars, Consequential damages in the amount of $ 3 million dollars, Punitive damages in the amount of $ 4 million dollars for conspiracy to deprive claimant of her liberty interest, and pain and suffering damages in the sum of $ 3 million dollars for their intentional infliction of emotional distress due to their negligence and defamation. Unlawful imprisonment on 10/10/05, Criminal and Family court attorney fees false Arrest 01/21/06 due to their malicious prosecution $4,790. Pay wrongfully withheld from both suspensions which were never substantiated in the amount of $9,700.

Marie S. Salvedon