UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

MARIE SHERLY SALVODON,

                        Plaintiff,

        -against-

SERGEANT JOSEPH RICOTTA, et al.,

                     Defendant.

-------------------------------------------------------------x

**MEMORANDUM AND ORDER**

07-CV-174 (ENV) (LB)

VITALIANO, D.J.

On January 10, 2007, *pro se* plaintiff Marie Salvodon filed this action pegged to state law braced by federal claims said to arise under 42 U.S.C. §§ 1983 and 1985(3). Essentially, she alleges that defendants violated her First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights. Her due process, First Amendment retaliation, and discrimination claims against all defendants, as well as all claims against the New York City Police Department, the City of New York, Lieutenant Vincent Cirrito, and Police Officer Burtchell were dismissed by Orders entered by this Court on September 30, 2008 and March 18, 2011. Surviving those Orders are ten constitutional claims, two counts of false arrest/imprisonment, two counts of illegal entry, excessive force, unlawful search, property damage, malicious prosecution, deliberative indifference to plaintiff's medical needs and supervisory liability against Commissioner Raymond Kelly, and numerous state law claims. On

1

November 14, 2012, defendants moved for summary judgment.[1]

For the reasons set forth below, summary judgment is granted to defendants as to all federal law claims as well as on the state law claims for false imprisonment and malicious prosecution. With respect to the remaining claims—those that are not clearly parallel to the federal claims dismissed on the merits—the Court declines to exercise supplemental jurisdiction over them. Those claims, namely for unreasonable search and seizure, assault and battery, abuse of authority, prima facie tort, conspiracy to commit tort, negligence, and gross negligence, are dismissed without prejudice to their refilling in a state court of appropriate jurisdiction, if filed within 30 days of the entry of this Order.[2]

## Background

Salvodon's claims arise from two separate incidents. The first took place on October 10, 2005, when New York City Police Department ("NYPD")

---

[1] Salvodon filed a document titled "Plaintiff's Opposition to Defendant's Motion for Summary Judgment to Dismiss the Second Amended Complaint, Supplemental." (Docket No. 102.) Pursuant to Order dated November 14, 2012, Salvodon's opposition was deemed timely. The submission did not include a Rule 56.1 Statement or otherwise present facts or evidence. Instead, Salvodon enclosed a handwritten note stating, "Please Take Notice other documents are on the way!" Whether such additions would be timely is of no moment, since no further documents have been filed to date. In addition, Salvodon's opposition raised two unrelated issues that warrant brief attention. First, she claimed that discovery was conducted in a way that was unfair to her. The Court reiterates that all discovery matters in this case were referred to Magistrate Judge Bloom. There are no pending appeals of any of Judge Bloom's discovery orders, including the order closing discovery. To the extent plaintiff's opposition papers may be read to assert an appeal of any discovery order, it is grossly late and deemed untimely. Similarly, to the extent embedded in her response is a request for permission to amend the complaint yet again, it is denied. Whatever supplementation plaintiff has now divined about this litigation, there is absolutely no showing as to why it could not have been advanced in a more timely fashion. There will be no third amended complaint, nor reopening of discovery.

[2] In granting leave, the Court expresses no view as to whether such causes of action exist much less whether they are meritorious. *See infra* p. 16-17.

officers responded to a 9-1-1 call reporting a burglary at plaintiff's building. Upon arrival, the officers observed Salvodon's son, Darren Flowers, climbing into a first floor window. Five NYPD officers—Officers Alessandro Longardino, William Ubieta, Christ Ottomanelli, and Michael White and Sergeant Joseph Ricotta— checked the first floor apartment before following the sound of footsteps and a slamming door to Salvodon's apartment. Hearing undecipherable voices behind Salvodon's door, the officers knocked and announced their presence. The voices quieted, but the officers were not otherwise acknowledged. Only when they used force to partially open the door did Salvodon begin communicating with them. The officers told her that they were pursuing a fleeing burglary suspect. In response, Salvodon, a NYPD officer herself, told the officers that she would not allow them to enter without a warrant and that she would report them to their duty officer. The five officers retreated.

Shortly thereafter, Salvodon approached the five officers' duty commander, Captain Mark DiPaolo, and identified herself as an off-duty police officer. When DiPaolo informed her that the police were looking for her son, she permitted DiPaolo and P.O. Walter Burtchell to enter her apartment to remove Flowers. Once Flowers was removed from the scene, DiPaolo asked Salvodon to report to the 70th Precinct for a GO-15 interview regarding her behavior toward the responding officers.[3] She refused. DiPaolo then threatened to have the Emergency

---

[3] A GO-15 interview is an investigative tool made available under the NYPD Rules for the purpose of determining whether a police officer should receive internal disciplinary measures. A

3

Services Unit ("ESU") taser her if she would not comply with his order. It appears that ESU was never called and never responded to the scene, and Salvodon agreed to proceed to the police station without further incident. DiPaolo waited outside Salvodon's apartment while she collected several personal items from her apartment and arranged for childcare for her grandchildren. Thereafter, he directed Sergeant Stacey Simone and Sergeant Robert Murray to drive Salvodon to the precinct. DiPaolo remained at the scene to oversee continuing investigatory procedures and to ensure that Salvodon's door was secured.[4]

When Salvodon arrived at the precinct, the sergeants brought her to a room, where she waited for approximately five and a half hours for her GO-15 interview.[5] Murray informed Salvodon that she was not in custody, and she was not prevented from walking to another floor to use the restroom or from making several telephone calls, including to her precinct's PBA representative. However, Simone and Sergeant Elizabeth Morrisey took turns sitting outside the door. Approximately an hour and a half after she arrived, Salvodon told Simone she wanted to leave but was instructed to wait for DiPaolo. Salvodon waited another four hours, at which point she told Simone to inform DiPaolo that she would leave the precinct even if she needed to push past Simone. At that point, Salvodon was

higher-ranking officer conducts the interview once the subject has an opportunity to consult with a delegate of the Police Benevolent Association ("PBA").

[4] Plaintiff testified during her deposition that, at some point, she asked Sergeant Edward Deighan to fix her door and that he refused.

[5] During this time, other officers involved in the incident at Salvodon's apartment participated in GO-15 interviews, presumably in connection with Salvodon's possible discipline.

brought to speak with the 70th Precinct's PBA representative. Salvodon declined his

assistance and informed him that she would not sit for the GO-15 interview, because

she had not been given the required 24 hours notice. The PBA representative

brought Salvodon to talk to DiPaolo, Sergeant Gary Hellreigel, and Lieutenant

Richard Tully. DiPaolo informed Salvodon that she was suspended without pay for

30 days for, among other things, disrespecting the officers who responded to the

incident at her building. Salvodon responded that she was leaving, and she was

permitted to do so.[6]

When Salvodon returned from her suspension on November 9, 2005,

she admits that she was served with Charges and Specifications stemming from the

October 10, 2005 incident.[7] Specifically, she was charged with engaging in conduct

prejudicial to the good order, efficiency, and discipline of the Department by

interfering with a criminal investigation (in that she prevented officers from

entering her home, mislead officers about the whereabouts of a suspect, and failed

to timely identify herself as a police officer); by treating NYPD officers

discourteously; and by disobeying Captain DiPaolo's order to report for a GO-15

interview. (Amended Compl. at 23-26.)

The second incident grew out of Salovodon's alleged violation of a

previously entered Temporary Order of Protection ("TOOP") that prohibited her

---

[6] Salvodon did not leave the building. Instead, she waited at the precinct for her son to be transported to central booking. No action was taken to prevent her from doing so.

[7] Charges and Specifications are formal administrative charges.

from harassing her daughter-in-law, Natasha Flowers. On January 1, 2006, Ms. Flowers called 9-1-1 to report that Salvodon had threated to physically hurt her. Sergeant Edward Kraemer responded to the call. He did not question, search or handcuff Salvodon. Rather, he instructed her to come with him and drove Salvodon to the 70th Precinct. There, she waited in a room with an unidentified officer standing by the door for approximately 19 hours.[8] At 9:30 a.m. on January 22, 2006, Salvodon was brought to central booking. Later that day, she was arraigned on charges of menacing in the third degree, criminal contempt in the second degree, and harassment in the second degree, and released on her own recognizance. On November 17, 2006, Salvodon accepted an Adjournment upon Contemplation of Dismissal. The case was dismissed and sealed on May 16, 2007.

## Analytical Standard

The Court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir.1995) (internal quotation marks omitted) (emphasis in original). The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, *see, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir.2005), and the Court

---

[8] Approximately three to four hours into this period, Kraemer informed Salvodon that she was under arrest for violating an Order of Protection. Several hours later, at approximately 8:00 p.m., Salvodon told the officer outside the room that she wanted to see Emergency Medical Services ("E.M.S."), because she had suffered a line-of-duty injury. The officer did not respond, nor did she acknowledge subsequent requests to call E.M.S. Salvodon does not claim that she ever advised the officer as to what her distress was nor does she describe any visible signs or symptoms that should have reasonably put the officer on notice that medical emergency assistance was required.

will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. *See, e.g., Sec. Ins. Co. of Hartford v. Old Dominion Freight Line. Inc.,* 391 F.3d 77, 83 (2d Cir.2004); *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.").

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party. *See* Fed.R.Civ.P. 56(e). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Rather, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986) (internal citations omitted).

If the motion is unopposed, summary judgment, if appropriate, shall be entered against the adverse party. Fed. R. Civ. Proc. 56(e). However, "[e]ven when a motion for summary judgment is unopposed, the district court is not

relieved of its duty to decide whether the movant is entitled to judgment as a matter

of law." *Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 242 (2d

Cir.2004); *see also Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001) ("when a

nonmoving party chooses the perilous path of failing to submit a response to a

summary judgment motion, the district court may not grant the motion without

first examining the moving party's submission to determine if it has met its burden

of demonstrating that no material issue of fact remains for trial").

Discussion

## 1. Illegal Entry

Salvodon alleges that, on two occasions, police officers violated her

Fourth Amendment right to be free from warrantless entry into her home. First,

she claims that, on October 10, 2005, Longardino, Ubieta, Ottomanelli, White, and

Ricotta forcefully opened her door while pursuing her son, Darren Flowers.

Second, she alleges that, on January 21, 2006, Kraemer and Sergeant Gerard

Castiglione unlawfully entered her home while responding to a 9-1-1 call, in which

Salvodon's daughter-in-law reported that Salvodon was threating to physically

harm her, not only in violation of law but also of a TOOP.[9]

As a general matter, the Fourth Amendment prohibits law

enforcement from entering a person's home without a warrant. *Arizona v. Hicks,*

480 U.S. 321, 326 (1987). However, it is well established that "officers may enter a

---

[9] The record shows only that Kraemer entered Salvodon's apartment. Although there is evidence
that Castiglione approved Salvodon's arrest, there is no substantial evidence that he actually
crossed her threshold and ever entered her apartment.

8

residence without a warrant when they have an objectively reasonable basis for believing that an occupant is . . . imminently threatened with [serious injury]." *Brigham City v. Stuart*, 547 U.S. 398, 400 (2006) (internal quotations omitted); *see also Ryburn v. Huff*, 132 S. Ct. 987, 990 (2012) ("[I]t would be silly to suggest that the police would commit a tort by entering [a residence] ... to determine whether violence ... is about to (or soon will) occur."). In assessing whether an imminent threat justifies warrantless entry in a particular situation, "[t]he core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action." *U.S. v. Simmons*, 661 F.3d 151, 157 (2d Cir.2011) (internal quotations omitted). "[R]easonableness must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ryburn v. Huff*, 132 S. Ct. at 992 (internal quotations omitted).

There is no dispute about the material facts essential to this claim. The scene that unfolded at Salvodon's residence on October 10, 2005 would surely lead a reasonable police officer to conclude that there was an urgent need to take action. Two 9-1-1 calls, including one from the apparent self-identified intended victim, alerted police that a suspect armed with a knife was attempting to enter an apartment for the alleged purpose of attacking the inhabitant.[10] *See Anthony v. City of New York*, 339 F.3d 129, 136-37 (2d Cir. 2003) (noting the probative value of

---

[10] Although defendants did not assert that they suspected Flowers of anything other than burglary, it would have been reasonable for the officers to believe, based on their observations at the scene, that Flower's also intended to commit assault.

an emergency call made by the intended victim from the site of the alleged attack to report the threat of physical violence). The police tracked the suspect to Salvodon's apartment, where they determined that others were present. Nothing in the record suggests that the officers knew either the identity of the other occupants or their relationship to the suspect at the time they opened the door. Consequently, they had a reasonable basis to believe that the armed suspect would physically injure others inside the apartment and, by extension, the right if not the obligation, to enter Salvodon's apartment without a warrant.

The Court reaches an identical conclusion with respect to the events of January 21, 2006. The intended victim of the confrontation personally called 9-1-1 to report that she was in imminent danger of physical harm. Nothing in the record suggests that the responding officers observed anything on the scene prior entering Salvodon's apartment that would have led them to believe that the threat had subsided.[11] Accordingly, the reported threat justified their warrantless entry.

Summary judgment is granted to defendants on plaintiff's illegal entry claims.

2. False Arrest and False Imprisonment

Plaintiff alleges that she was falsely arrested on October 10, 2005, when Captain DiPaolo admittedly (whether sreiously not) threatened to have a taser used on her if she did not report to the 70th Precinct, and when unspecified defendants

---

[11] Salvodon testified that Ms. Flowers had left the apartment. However, she failed to proffer evidence demonstrating that the responding officers were aware of her exit at the time they entered the apartment.

required her to await her GO-15 interview in a room at the precinct. Similarly, she challenges her arrest following Natasha Flower's 9-1-1 call on January 21, 2006.

To prevail on a § 1983 or New York state law false arrest or false imprisonment claim, a plaintiff must demonstrate that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. State*, 37 N.Y.2d 451, 456 (1975); *see also Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Probable cause "constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Weyant v. Okst*, 101 F.3d at 852 (internal citation and quotations omitted).

Probable cause is present "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (internal quotations omitted). Whether probable cause exists "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him . . . and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470–71 (1985) (internal quotations omitted). Even absent probable cause to arrest, a police officer will be entitled to qualified immunity if he can demonstrate that there was arguable probable cause for the arrest. *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir.2004).

11

It is beyond cavil that probable cause justified Salvodon's arrest on

both October 10, 2005[12] and on January 21, 2006. In the first instance, the fact that

Captain DiPaolo had learned firsthand from police officers in his command that

Salvodon prevented them from lawfully entering her apartment in pursuit of a

fleeing felon is not in genuine dispute. The police officers' report provided objective

facts that warranted a belief that Salvodon had committed the crimes of criminal

facilitation, obstructing governmental administration, interfering with a peace or

police officer, resisting arrest, and hindering prosecution. *See* N.Y. Penal Law §

195.05 (McKinney). Similarly, the arresting officers who responded to the January

21, 2006 9-1-1 call reasonably believed, on the basis of Natasha Flower's report, that

Salvodon had committed criminal contempt by violating an existing TOOP as well

as menacing and harassment by threatening Flowers. Accordingly, summary

judgment is granted to defendants as to Salvodon's false arrest and false

imprisonment claims.

3. Excessive Force

Salvodon asserts an excessive force claim predicated upon DiPaolo's

threat to call the ESU to use a taser on her if she did not go to the 70th Precinct as

directed on October 10, 2005. To prevail on an excessive force claim, a plaintiff

---

[12] It is far from clear that plaintiff was ever arrested or imprisoned at any time in the aftermath of the October 10, 2005 incident. The facts strongly suggest that Captain DiPaolo was doing all that he could to avoid "arresting" Salvodon and to keep the matter one for internal police discipline, *ie.*, the GO-15 process, rather than a Criminal Court complaint. That effort also manifested itself in "threats" made to Salvodon designed to secure her presence at the precinct for a GO-15 interview. Nonethless, for purposes of this motion, it is assumed, but not determined, that Salvodon was actually "arrested" or "imprisoned" when she was escorted to and asked to remain at the 70th Precinct.

must show that "the amount of force [actually] used was objectively unreasonable." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (internal quotations omitted). Plaintiff cannot state a claim on DiPaolo's threat alone. "Mere threatening language and gestures . . . do not . . . amount to [a] constitutional violation[]." *Murphy v. Pizarrio*, 1995 WL 565990 at *3 (S.D.N.Y. 1995); *see also Brown v. Brabazon*, 1998 WL 177612 (E.D.N.Y. 1998) *aff'd*, 166 F.3d 1199 (2d Cir. 1998). Clearly, Salvodon does not allege, and, more importantly, the record certainly does not bear out that DiPaolo followed through on his "threat" or otherwise physically harmed or attempted to physically harm Salvodon. Accordingly, Salvodon's excessive force claim fails as a matter of law.

### 4. Property Damage

Plaintiff also seeks recovery against Longardino, Ubieta, Ottomanelli, White, and Ricotta for an asserted violation of her Fourth Amendment rights by using excessive force to enter her apartment while pursuing Flowers on October 10, 2005.[13] "Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful. . . ." *United States v. Ramirez*, 523 U.S. 65, 71 (1998). "Before any due process liability can be imposed for property damage occurring in a lawful search, it must be established that the police acted unreasonably or maliciously in bringing about the damage." <u>Cody v. Mello</u>, 59 F.3d 13, 16 (2d Cir. 1995). The material facts are, once

---

[13] To the extent Salvodon also attempts to bring a property damage claim against Deighan for failing to fix her door, she fails. As she admits in her Second Amended Complaint, ESU fixed her door the same day it was broken.

again, not in genuine dispute. The responding officers used, but did not exceed, an amount force sufficient only to slightly open Salvodon's door, despite the undisputed fact that they were pursuing what they reasonably believed on objective facts to be an armed felon. Nothing in the record suggests that malice motivated their action. Rather, they did the minimum necessary to lawfully apprehend a potentially dangerous suspect. Judgment on this claim is for defendants.

5. Illegal Search

Included in Salvodon's mix of claims, she advances one for illegal search, alleging that, on October 10, 2005, unnamed officers conducted a warrantless search of her home without her consent. Even assuming that such officers are party to this suit, Salvodon's cause must fail, because she does not proffer an iota of admissible evidence demonstrating that the officers, in fact, searched her home. *See* F.R.C.P. 56(c)(1)(B). Rather, the record reflects only that Salvodon testified at her deposition that she had been told that the police searched her apartment after she was taken to the 70th Precinct. Such statements are hearsay and, therefore, are not properly before the Court. *See Fed. R. Evid.* 802. In the absence of any admissible evidence, summary judgment dismissing the illegal search cause of action is mandated.

6. Malicious Prosecution

Plaintiff asserts that she was maliciously prosecuted for her alleged violation of the TOOP that prohibited her from harassing her daughter-in-law. To prevail on either a § 1983 or a state law malicious prosecution claim, a plaintiff must

14

demonstrate that the criminal proceeding at issue was terminated in the plaintiff's

favor. *See Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003). Here, the

proceeding against Salvodon was adjourned in contemplation of dismissal, which

does not constitute a termination in her favor. *See Singleton v. City of New York*, 632

F.2d 185, 193 (2d Cir. 1980). These claims, therefore, are dismissed as well.

## 7. Deliberate Indifference

Following her arrest on January 21, 2006, an unnamed female police

officer, whom Salvodon described to be of African American descent, purportedly

ignored her request to call E.M.S. and therefore allegedly violated her Eighth

Amendment rights.[14] Plaintiff's inability to identify the officer is dispositive. The

Court has already dismissed all claims against the City, and, as discussed *infra*, the

record does not support a supervisory liability claim against Police Commissioner

Raymond Kelly. As a result, only the individual defendants remain party to the

lawsuit. No such indifference is alleged against them. In any event, a simple request

for EMS assistance without more is insufficient to state a medical indifference claim.

*Cf Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (*quoting Farmer v. Brennan*,

511 U.S. 825, 837 (1994) (holding that defendant must "'[know] and disregard[] an

excessive risk to [plaintiff's] health or safety'" and "'both [be] aware of facts from

---

[14] Strictly speaking, the Eighth Amendment is not applicable to pre-trial detainees. *Caiozzo v. Koreman*, 581 F.3d 63, 70 (2d Cir. 2009). Rather, a plaintiff who has not been convicted of a crime may allege deliberate indifference in violation of his due process rights under the Fourteenth Amendment. *Id.* The standards for the two claims are identical. *Id.*

which the inference could be drawn that a substantial risk of serious harm exist[ed],

and ... also [draw] the inference'"). Salvodon proffers no evidence as to what her

claimed distress was, nor does she demonstrate that the signs and symptoms that

were present reasonably placed anyone on notice that medical assistance was

appropriate. The medical indifference claim, even if pleaded against any remaining

individual defendant, is baseless and is dismissed.

## 8. Supervisory Liability

Salvodon also advances a supervisory liability claim against

Commissioner Kelly. "Because vicarious liability is inapplicable to . . . § 1983 suits,

a plaintiff must plead that each Government-official defendant, through the

official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*,

556 U.S. 662, 676 (2009). Salvodon makes no such allegations, much less proffers

evidence demonstrating Commissioner Kelly's involvement in her alleged ordeal.

Accordingly, summary judgment is granted against Salvodon on her supervisory

liability claim.

## 9. State Law Claims

After passing on the summary judgment motion, there are no federal

causes of action left to try. "In general, where the federal claims are dismissed

before trial, the state claims should be dismissed as well." *Marcus v. AT&T Corp.*,

138 F.3d 46, 57 (2d Cir. 1998). However, the congruence between Salvodon's state

and federal false arrest or imprisonment and malicious prosecution claims dictates

that the instant judgment must control both the federal claims and their state law

analogues. The Court, therefore, exercises supplemental jurisdiction with respect to such claims, which are dismissed with prejudice.

Although plaintiff's remaining state law claims—unreasonable search and seizure, assault and battery, abuse of authority, prima facie tort, conspiracy to commit tort, negligence, and gross negligence—arise from the same underlying facts, the alleged causes are distinct from Salvodon's federal claims. The Court declines to exercise supplemental jurisdiction over them and dismisses them without prejudice. In so doing, the Court's Memorandum and Order is not to be read as finding that any of these claims might actually lie under New York law, and, if they do, as to the precedential effect the instant case may have upon them.

## Conclusion

For all the forgoing reasons, defendants' motion is granted to the extent that plaintiff's federal law claims and her New York state law claims for false arrest or imprisonment and malicious prosecution are dismissed with prejudice as to all defendants. The Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims and, thus, any such claims are dismissed without prejudice to their refiling in a state court of competent jurisdiction within 30 days of the entry of this Memorandum and Order on the docket. The Clerk of Court is directed to enter judgment accordingly and to close this case.

The Clerk is further directed to mail a copy of this Memorandum and Order to plaintiff at her last known address of record.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal

from this order would not be taken in good faith and therefore *in forma pauperis*

status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S.

438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).


        SO ORDERED.


Dated:        Brooklyn, New York
              July 14, 2011


                                        s/ ENV

                                        ERIC N. VITALIANO
                                        United States District Judge